524 So.2d 428 (1988)
John Thor WHITE, Appellant,
v.
BOARD OF COUNTY COMMISSIONERS FOR PINELLAS COUNTY, a Political Subdivision of the State of Florida, Appellee.
No. 87-1136.
District Court of Appeal of Florida, Second District.
January 15, 1988.
Rehearing Denied February 17, 1988.
John Thor White, pro se.
John E. Schaefer, Asst. Co. Atty., Clearwater, for appellee.
RYDER, Acting Chief Judge.
Appellant was court-appointed counsel in a first degree murder case. After conclusion of the case, appellant petitioned for attorney's fees. At a hearing on the matter, at which all interested parties were heard, there was no dispute that appellant performed 134 reasonable and necessary hours of high quality representation. The statutory maximum for this type of case is $3,500.00. § 925.036(2)(d), Fla. Stat. (1985). The trial court, in a lengthy, thoughtful order, discussed certain policy considerations in determining compensation for court-appointed counsel, then reluctantly limited the award of attorney's fees to the statutory maximum based upon what it perceived as the restrictions of the statutory provisions and the case of Makemson v. Martin County, 491 So.2d 1109 (Fla. 1986), cert. denied, ___ U.S. ___, 107 S.Ct. 908, 93 L.Ed.2d 857 (1987). Appellant filed a notice of appeal.
"The proper procedure for challenging an order awarding attorney's fees to court appointed counsel is by petition for certiorari, not appeal." Schommer v. Bentley, 489 So.2d 40, 41 (Fla. 2d DCA), reversed on other grounds, 500 So.2d 118 (Fla. 1986). Accordingly, we treat this appeal as a petition for certiorari. We hold that the trial court did not depart from the essential requirements of law in either substance or procedure.
Certiorari denied.
SCHOONOVER, J., concurs.
LEHAN, J., dissents with opinion.
LEHAN, Judge, dissenting.
I respectfully dissent. I would hold that the trial court departed from the essential requirements of law.
Makemson permits attorneys fees to court-appointed counsel for indigent defendants in capital cases to exceed the $3,500 statutory maximum fixed by section 925.036(2)(d) in "extraordinary and unusual cases... ." 491 So.2d at 1115. In this case the trial court, with which the majority of this appellate panel apparently agrees, interpreted Makemson as defining the term "extraordinary and unusual" as being restricted to cases which are like Makemson and are, in the words of the trial court, "high profile, heavily prosecuted." In purporting to distinguish Makemson, the trial court noted that in that case defense counsel spent "sixty-four hours of ... time at a *429 Courthouse some 150 miles from his home" and "[h]is representation of the Defendant spanned a nine month period." The trial court concluded that this case was not extraordinary and unusual within that definition.
I do not disagree that this was not a "high profile, heavily prosecuted case." At least I do not disagree that the trial court did not abuse its discretion in reaching that conclusion.[1] There is no record of the capital case before us to indicate one way or the other. But I conclude that the supreme court in Makemson did not mean to restrict the definition of the term "extraordinary and unusual" in the foregoing manner. I conclude that the supreme court meant that term to include a case like that involved here which, as the trial court's findings show, was a capital case requiring an extraordinary and unusual amount of time on the part of competent defense counsel relative to the time for which the statutory maximum fee would provide reasonable compensation.
Accordingly, I would conclude that the trial court erred in ruling that the $3,500 statutory maximum fee for petitioner's court-appointed representation of an indigent defendant in a capital case through trial could not properly be exceeded. While I understand the basis on which the majority interpreted Makemson as requiring a denial of the petition for certiorari, I conclude that the petition should have been granted and that the order should have been reversed. I conclude that the majority opinion is in conflict with Makemson and that it should be certified to the Florida Supreme Court as passing upon a question of great public importance.
The reasons why the maximum fee fixed by section 925.036(2)(d) should, in my view, not be adhered to in this case involve not only an interpretation of Makemson which is different from that of the trial court and the majority of this appellate panel but also involve very fundamental legal issues. Those legal issues involve, in turn, fundamental philosophies of government. This dissenting opinion undertakes to explain that different interpretation of Makemson and also deals with those legal issues and philosophies.
The trial court's order contains the following findings: that over a period of "approximately 3 1/2 months" the attorney "expended 134 hours on this case and that all hours were reasonable and necessary"; that "counsel did an excellent job of representation"; that "[e]xpert witness testimony ... indicated that a reasonable fee would be $12,135"; that the attorney "indicated that, as it was a court-appointed case, he would find $50/hour for 134 hours or a fee of $6,700 to be reasonable"; that "[i]t has been the task of this Court to locate and appoint attorneys to capital cases and hence this Court is more than well aware of the difficulty in a) obtaining competent counsel to handle such cases, who b) are willing to accept these cases at the current statutory levels"; that "attorneys will barely make their overhead when they take such cases"; that "[i]t is patently clear that the statutory limitations are, in this day and age, unrealistic"; that "[w]hen this Court had initially reviewed the fee petition, it had indicated to Petitioner that it would grant a fee of $5,000, knowing full well that this exceeded the statutory maximum, but also knowing the various financial and professional problems associated with court-appointed representation in capital cases"; that "often times such Orders in no way establish the true value of the services performed by dedicated members of the criminal defense bar"; and that "the Court is familiar with the problems experienced by counsel when they accept court-appointed capital cases and is more than sympathetic with their plight." In addition, the record reflects that 63 of petitioner's 134 hours on the case were in court (approximately the same amount of court time as that of the attorney in Makemson) *430 and that petitioner had had substantial prior experience in capital cases at both the trial and appellate levels.[2] Notwithstanding those aspects, the trial court denied petitioner's request for a fee above the statutory maximum.
A ruling like the one before us, aside from being patently unfair to the attorney involved, virtually invites underrepresentation of indigent criminal defendants in future cases. The Florida Supreme Court in Makemson, having recognized that the legislature would not correct the unrealistically low statutory maximum, or at least had not done so, construed the statute to be "directory rather than mandatory in nature," 491 So.2d at 1115, and provided the route for trial courts to take in future cases to exceed the maximum when it would grossly undercompensate defense counsel. I conclude that the trial court in this case erred in failing to follow that route and in following instead a narrow interpretation of Makemson. Yet the trial court, having appellate review in mind as the order also shows, most commendably and helpfully set out in its order the above-quoted findings which serve to epitomize the substantial unfairness of the situation to both attorneys and indigent criminal defendants.
While Makemson was a high profile, heavily prosecuted case, the supreme court did not precisely define the term "unusual or extraordinary" which it said is the type of case in which the statutory maximum may be exceeded.[3] Yet it did provide a definition of the term which should be applied in this case. After referring to that term, the supreme court said that the statutory maximum may be exceeded "when necessary in order to ensure that an attorney who has served the public by defending the accused is not compensated in an amount which is confiscatory of his or her time, energy and talents. More precise delineation, we believe, is not necessary." 491 So.2d at 1115. The assistant county attorney in this case, while taking the position at the fee hearing that this was not an "extraordinary" case, argued that "[u]nfortunately, they [the supreme court] don't really tell us what that is... ." I conclude that the supreme court did tell us what that is and that it is what this case is.
Another way of saying the same thing is that a case should be considered unusual and extraordinary within the import of Makemson so as to call for exceeding the statutory maximum under the following circumstances: when, due to the time necessarily expended by competent defense counsel, the statutory maximum fee is so substantially out of balance with a reasonable fee that the imbalance, anticipated to occur again in the future in similar cases, would constitute such a penalty that competent counsel would not offer, or would rarely offer, their services, thereby materially impairing the rights of indigent defendants to competent counsel. To borrow from a quotation of the trial court in Makemson which the supreme court set forth in that case, that point for exceeding the statutory maximum is reached when the imbalance between a reasonable fee and the statutory maximum is such as to show that the statute, if construed to be mandatory, is "impractical and won't work." 491 So.2d at 1111. As the supreme court also said,
[T]he statute [is] unconstitutional when applied in such a manner as to curtail the court's inherent power to ensure the adequate representation of the criminally accused. At that point, the statute loses its usefulness as a guide to trial judges in calculating compensation and becomes an oppressive limitation. As so interpreted, therefore, the statute impermissibly encroaches upon a sensitive area of judicial concern, and therefore violates article V, section 1, and article II, section *431 3 of the Florida Constitution. (Emphasis added.)
491 So.2d at 1112. (The word "curtail" is emphasized in the foregoing quotation to stress that the point does not have to be reached where that inherent power is crippled or destroyed.) It is at that point that the burden is met of showing that "exceeding the statutory maximums was necessary in order to enable [the trial court] to perform its essential judicial function of ensuring adequate representation by competent counsel." 491 So.2d at 1113. These quotations from Makemson are a reflection of the proposition to which the supreme court referred when it also said, "we must once again affirm the proposition that `the courts have authority to do things that are absolutely essential to the performance of their judicial functions'... ." 491 So.2d at 1113.
The trial court in the case before us certainly appears to have recognized the problem in its order by stating that "[i]t is patently clear that the statutory limitations are, in this day and age, unrealistic;" by referring to "the various financial and profession [sic] problems associated with court-appointed representation in capital cases;" in recognizing that under its interpretation of Makemson often "attorneys will barely make their overhead;" and by saying that the court was "more than sympathetic with [the] plight" of defense counsel in such cases.
Makemson relied upon the inherent powers doctrine. Under that doctrine, the courts not only have the inherent power to regulate the practice of law, but also have the power to prohibit legislative regulation of the practice of law. "[C]ase law is overwhelmingly in support of" the proposition that any "invasion of the legislature into an area within the inherent and exclusive authority" of state supreme courts is "impermissible." Pennsylvania Public Utilities Comm'n v. Thornburgh, 62 Pa.Commw. 88, 434 A.2d 1327 (Pa. Commw. Ct. 1981), aff'd, 498 Pa. 589, 450 A.2d 613 (Pa. 1982), quoted in R. Aronson, J. Devine, and W. Fisch, Problems, Cases and Materials in Professional Responsibility 53 (1985).
The cornerstone of the doctrine of the inherent powers of the courts to regulate the practice of law is the doctrine of separation of powers. An attorney is part of the judicial system which is, of course, a separate, independent branch of government. Rules Regulating the Florida Bar (Preamble to ch. 4, Rules of Professional Conduct), 61 Fla.B.J. 64, 65 (Sept. 1987). An attorney is "an officer of the Court and a member of the third branch of government." DeBock v. State, 512 So.2d 164, 166 (Fla. 1987). To fulfill the separation of powers doctrine the inherent powers doctrine may be invoked when there is the necessity to protect the independence of the judicial branch from the executive or legislative branches so as to provide the checks and balances to which the success of this country's form of government is to a large extent attributable. When legislatively-fixed attorney's fees become so out of line with reality that they materially impair the abilities of officers of the courts to fulfill their roles of defending the indigent and curtail the inherent powers of the courts to appoint attorneys to those roles and thereby impair the Sixth Amendment right of indigents to counsel, such legislative regulation of the bar, which may otherwise be acceded to by the judiciary, may be declared invalid or be construed as directory and not mandatory.
The inherent powers doctrine is recognized in "virtually all American states as an integral part of the tripartite system of government." Shapiro, "Judicial Control Over the Bar Versus Legislative Regulation of Governmental Ethics: The Pennsylvania Approach and a Proposed Alternative," 20 Duq.L.Rev. 13 n. 4 (1982). The Florida Supreme Court in Rose v. Palm Beach County, 361 So.2d 135, 137 (Fla. 1978), set out the basis for, and the requisites for the application of, the doctrine in the following terms which seem fully applicable to the case at hand:
Every court has inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction, subject to valid existing laws and constitutional provisions. The doctrine of inherent judicial *432 power as it relates to the practice of compelling the expenditure of funds by the executive and legislative branches of government has developed as a way of responding to inaction or inadequate action that amounts to a threat to the courts' ability to make effective their jurisdiction. The doctrine exists because it is crucial to the survival of the judiciary as an independent, functioning and coequal branch of government. The invocation of the doctrine is most compelling when the judicial function at issue is the safeguarding of fundamental rights.
The supreme court, in explaining why the statutory maximum was properly exceeded in Makemson, also referred to "the increasing complexity of some of today's cases... ." 491 So.2d at 1114. For the following four reasons I would not interpret that to mean that the statutory maximum may only be exceeded in those capital cases which are more complex than others.[4]First, as pointed out above, the supreme court otherwise defined the term "extraordinary and unusual" as delineating when the statutory maximum may be exceeded. Second, no particular standard for gauging which case is and which case isn't factually complex, or extraordinary or unusual, is prescribed in Makemson. The subjective perceptions of trial courts in that regard may vary substantially, depending upon the frames of reference, experiences and propensities of particular judges. Third, immediately after referring to the complexity of "some" cases, Makemson refers to those cases "[calling] for the investment of more time and effort in order to effectively represent one's client." 491 So.2d at 1114. Thus, again, the key is the time necessarily devoted to the case, not necessarily its factual variation from other capital cases. It is doubtless true that complex cases and those that are factually extraordinary and unusual frequently require extraordinary and unusual amounts of time on the part of defense counsel. But those are not the only kinds of cases which require extraordinary and unusual time. It is not difficult to imagine a frame of reference under which a "routine" case would require a greater investment of time on the part of defense counsel than a complex case. The time expended in Metropolitan Dade County v. Gold, 509 So.2d 407 (Fla. 3d DCA 1987), which was found to be "an extraordinary and unusual case entitling the Special Assistant Public Defender to a legal fee in excess of the amount set forth in the Statute," id. at 408, was 110 hours, which was substantially less than the 134 hours expended by petitioner in the case at hand.
Again, that a case is complex or, is, as the trial court in this case characterized Makemson, a so-called "high profile" case which is "heavily prosecuted" does mean that the case likely provides an example of when a large expenditure of time by defense counsel is necessary. But in the case at hand the trial court otherwise justified petitioner's relatively large expenditure of time simply by finding that "all hours were reasonable and necessary." I conclude that the description in Makemson of the high profile, heavily prosecuted background of that case provided an example of a situation in which the statutory maximum may be exceeded and should not be taken as a limitation upon situations in which the maximum may be exceeded. That conclusion appears to be supported by Justice Overton's dissent in Metropolitan Dade County v. Bridges, 402 So.2d 411, 417 (Fla. 1981). Makemson specifically receded from the majority opinion in Bridges. Justice Overton took the position that the Sixth Amendment "clearly applies in those cases which have multiple issues and large numbers of witnesses ... especially ... when a case requires an exceedingly large amount of an attorney's time for adequate representation." (Emphasis added.)
Fourth, it may be judicially noticed that in this day and time many capital cases may be considered to be extraordinary or *433 unusual. This is reflected in the unusual attention the Florida Supreme Court appears to devote to the capital cases before it, especially those in which the death penalty was imposed. Surely an attorney defending an indigent client who is subject to the death penalty in a capital case and who, in the words of the Makemson trial court, has "the dreadful responsibility involved in trying to save a man from electrocution," 491 So.2d at 1111, should do no less. Thus, the time expended in a capital case may well become unusual and extraordinary in comparison with other criminal cases, regardless of whether or not the case is "complex."
The majority's denial of certiorari in this case seems to represent agreement with the trial court that it could disregard, and was bound to disregard, a substantial disparity between a reasonable fee and the statutory maximum. But, although as Makemson says, the "trial courts [are] most intimately aware of the complexity of the case and the effectiveness of counsel," 491 So.2d at 1113, that did not mean that only trial courts can decide when the statutory maximum can be exceeded. The supreme court later in its Makemson opinion specifically recognized that "[t]rial and appellate judges" can "know best those instances in which justice requires departure from the statutory guidelines." 491 So.2d at 1115.
The foregoing portion of the Makemson opinion referring to trial courts was background for the point which the supreme court made that trial judges who had felt in particular cases in the past that statutory fee maximums must be exceeded should no longer be ignored. 491 So.2d at 1113-14. As to those courts the supreme court said, "We can no longer afford to ignore the message these courts have been attempting to send." 491 So.2d at 1114. It may be concluded that that message has been ignored in the case at hand by both the trial court and the majority of this appellate panel. Those past cases cited in Makemson which sent "the message," involved, like this case, a substantial imbalance between a reasonable fee in light of the time devoted by defense counsel and the statutory maximum fee. Also, those cases, like this case as found by the trial court, were not shown to have involved factual situations that were extraordinary or unusual. In fact, in one of those cases, Dade County v. Strauss, 246 So.2d 137, 140 (Fla.3d DCA 1971), the Third District Court of Appeal specifically concluded that the case was not factually extraordinary.
I recognize that in Makemson the supreme court also stated that "the victim of the crime was a member of a prominent local family" and "the entire resources of the prosecutor were brought to bear" in that case and recited background facts in that regard, i.e., the numbers of prosecutors, investigators, depositions, and witnesses. 491 So.2d at 1111. But, again, that recitation should not be taken as necessarily connoting a definition of or limitation on what may constitute an unusual or extraordinary case which may justify exceeding the statutory maximum. The principal bearing of those recited facts upon the issue of the proper fee to be awarded to defense counsel in Makemson was related to the time which defense counsel was called upon to expend and thus to the relationship between a reasonable fee and the statutory maximum. In the paragraph of that opinion immediately following that recitation the supreme court outlined in detail the time expended by defense counsel and the great disparity between both the market value of the attorney's services and the amount of fee he requested vis-a-vis the statutory maximum. If the above referenced background facts recited in Makemson were to establish such a limitation, the entire thrust of the supreme court's pronouncements in Makemson would suffer. That thrust was the imperative of not grossly underpaying competent defense counsel who make themselves available for appointment in capital cases so that in the future indigent defendants would have, through such counsel, their Sixth Amendment rights to effective representation. 491 So.2d at 1115. That aspect was specifically said to be the court's "focus." 491 So.2d at 1112.
*434 Along those same lines Makemson points out:
A survey of the repeated attacks on the validity of the statute highlights the strong tension between the counties' treasuries, as protected by the statutory maximum fees, and the attorneys seeking compensation more fair than that the legislature would grant. As previously pointed out, we must focus upon the criminal defendant whose rights are often forgotten in the heat of this bitter dispute. In order to safeguard that individual's rights, it is our duty to firmly and unhesitatingly resolve any conflicts between the treasury and fundamental constitutional rights in favor of the latter.
Id. at 1113.
When the United States Supreme Court, in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), found fundamental the right to effective counsel and established the state's duty to provide representation to the indigent, it by no means intended to place the weight of this duty upon the shoulders of a few individual practitioners appointed by the court. The system as it presently stands forces these individuals, in the most difficult cases, to bear a burden which is properly the state's with only token compensation for their efforts.
Id. at 1114.
We simply cannot on the one hand instruct the bench and bar, as we did in Wilson v. Wainwright, 474 So.2d 1162, 1165 (Fla. 1985), that `[a] perfunctory appointment of counsel without consideration for counsel's ability to fully, fairly and zealously advocate the defendant's cause is a denial of meaningful representation which will not be tolerated,' and at the same time deny the courts the ability to exceed the fee limits when necessary to do justice.

Id. If hindsight as to the large resources the state had brought to bear upon a particular prosecution were to be the criterion for exceeding the statutory maximum fee at the end of a trial, Makemson could not achieve with any consistency its purpose of not discouraging competent counsel from making themselves available for appointment to represent indigent defendants in future capital cases. There would frequently be no way for counsel to reliably know at the time they make themselves available for a particular case what resources the state will actually bring to bear before and at trial. I do not conclude that the supreme court meant in Makemson that defense counsel should be adequately paid, even on a minimal basis, only in high profile cases attracting great public, as well as prosecution, interest or that attorneys who are asked to undertake the defense representation in a capital case somehow have the clairvoyance to perceive whether the case will be of that kind, or, for that matter, that they will be able to perceive with any substantial assurance how much time will be necessary to devote to the case in order to provide effective representation. Nor do I conclude that the supreme court in Makemson meant that attorneys who are to be encouraged to make themselves available to represent indigent defendants in capital cases should be only those to whom a reasonable fee might not be as important, e.g., those who are of means, those in large firms more capable of taking up the slack, those who need the money that even an excessively low fee would bring in, or those with such pronounced altruism as to cause them to make severe sacrifices. To the contrary, the supreme court in Makemson was concerned about a fee not "confiscatory of his or her time, energy and talents." 491 So.2d at 1115.
There has long been a professional obligation of attorneys to make themselves available for court appointment as counsel to indigent defendants in capital cases. This kind of professionalism in the legal profession is, unfortunately, little understood outside the profession. (To a substantial extent that may be the result of the profession's lack of adequate public information and education in the past which, in turn, may serve to explain at least partially the lack of legislative response to the problem with the statutory *435 maximum involved here.[5]) It would be a travesty of justice to penalize those attorneys who fulfill that obligation and who thereby, as a result of the 1963 U.S. Supreme Court decision in Gideon v. Wainwright, "bear a burden which is properly the state's... ." 491 So.2d at 1114. It is only natural that the continuation of the unfair system reflected by the trial court's order in this case would inevitably reduce the numbers of competent counsel who make themselves available for such appointments, regardless of their sense of professional responsibility. A court should not be faced with compelling attorneys to accept such appointments at financial losses and thereby being required to themselves pay what it is now under Gideon the obligation of the state to pay. In certain cases such losses may well involve the viable, established law practice of the appointed attorney who, while representing an indigent, is in no position to serve other clients.[6]
In the days before Gideon established the constitutional obligation of the state to provide representation to the indigent, attorneys filled the breach either voluntarily or in some cases involuntarily under court order. In so doing attorneys fulfilled their ethical obligations to the poor by providing free services. After Gideon established that obligation of the state, the ethical obligations of attorneys did not disappear. There came into existence dual obligations  the constitutional obligation of the state and the ethical obligation of the attorney. Certainly the constitutional obligation of the state is primary. No just reason appears why a certain class of taxpayers  the relatively small numbers of attorneys *436 who are appointed to represent indigent defendants  should bear more of the cost of the constitutional obligation than other taxpayers. As Justice Ervin said in his dissent in Mackenzie v. Hillsborough County, 288 So.2d 200, 202 (Fla. 1973), which was quoted with approval in Makemson, "No citizen can be expected to perform civilian services for the government when to do so is clearly confiscatory of his time, energy and skills, his public service is inadequately compensated, and his industry is unrewarded... ." 491 So.2d at 1114.
If the state should find itself in the position of being unable to fulfill its constitutional obligation, the attorney's ethical obligation should again fill the breach. But it seems at least unlikely that, short of something like a very severe economic depression, the state would be in that position. Yet the state, perhaps still under the influence of pre-Gideon days, seems to attempt to share its obligation with certain attorneys by promulgating statutory maximum amounts for the state to pay. If those maximums were treated as mandatory, the state would have failed to honor its primary obligation. Thus, as the supreme court said in Makemson, the statute is directory, not mandatory, and its maximum may be exceeded in extraordinary and unusual cases.
The case before us will, if not reversed, convey a message to competent attorneys that if they make themselves available to represent indigent defendants in capital cases, they do so at their own risk which may well be the risk of becoming ensnared in a low profile, high investment of time case to which they must devote their lives during a particular time span at an extremely low fee, making themselves unavailable for other work to the detriment of their abilities to earn a livelihood for themselves and their families.
In summary, the supreme court in Makemson meant to provide a solution to the severe problem, and that solution should be implemented in this case.
The problem being as great as it is, it may be concluded that the Florida legislature, which is presumed to have been aware of the Makemson opinion, has, in light of that opinion, found no need to amend the statute and recognizes that the solution is to come from the implementation of Makemson through the courts. To conclude otherwise would be to conclude that the State of Florida has turned its back on "the state's duty to provide representation to the indigent" as was established by the United States Supreme Court in Gideon which directly concerned the State of Florida. 491 So.2d at 1114. The legislature may be presumed to have done no more than to recognize the inherent powers of the courts in that regard.
There is a concern  and of course a legitimate and serious concern  for the "counties' treasuries," 491 So.2d at 1113, which are to disburse the fees. But it bears repeating that, as Makemson made clear, exercising the inherent powers of the courts to exceed the statutory maximum is most decidedly not for the purpose of rewarding attorneys with the market values of their fees but is to provide reasonable fees in the low range in order to fulfill the Sixth Amendment to the United States Constitution. Id. The judicial restraint which should be exercised in the extent to which the statutory maximum is exceeded is described in Justice Sundberg's concurring opinion in Bridges: "The test would not be lavish compensation nor that which would be expected from a pecunious client, rather it would be that amount which is fair in light of the lawyer's professional obligation to the poor and not confiscatory of his time and talents." 402 So.2d at 415.
Judicial restraint in fixing the amount of attorney's fees above the statutory maximum should reflect the courts' continued recognition that their inherent powers are to be exercised sparingly. As the supreme court said in that regard in Rose,
[T]he courts find themselves in the position of one who must play the dual role of being both a referee and a partisan participant in an athletic contest. Like the other two branches, the judiciary is interested in preserving its prerogatives and may sometimes be in an adversary position, vis-a-vis the other branches, with regard to the ongoing contest over governmental power. Yet it is the judiciary *437 that must decide upon the ultimate delineation of power. The doctrine of inherent power should be invoked only in situations of clear necessity. The courts' zeal in the protection of their prerogatives must not lead them to invade areas of responsibility confided to the other two branches. Accordingly, it is with extreme caution that this Court approaches the issue of the power of trial courts to order payments by local governments for expenditures deemed essential to the fair administration of justice.
361 So.2d at 138. Thus, there is the recognition by the courts that, as the Kansas Supreme Court has said, the inherent power of the courts "is not an arbitrary and despotic power to be exercised at the pleasure of the court, or because of passion, prejudice, or personal hostility; rather, it is to be used with moderation and caution in the exercise of sound judicial discretion." Martin v. Davis, 187 Kan. 473, 478, 357 P.2d 782, 787 (1960). Also reflected is the tenet that substantial cooperation and accommodation between the three branches of government is essential to the effective functioning of this country's form of government.
In taking a cautious approach to the exercise of their inherent powers courts are simply demonstrating their recognition that legislative power must also be preserved in its proper sphere and scope. For example, in Palm Harbor Special Fire Control District v. Kelly, 500 So.2d 1382 (Fla. 2d DCA 1987), aff'd, 516 So.2d 249 (Fla. 1987), this court pointed to the importance of courts harmonizing two facially inconsistent statutes when reasonably possible so that there would not be an encroachment upon legislative power through either the executive or judicial branch choosing to follow one statute and to ignore the other. As we said in that case,
The courts ... recognize the importance of the separation of powers doctrine, one of the bulwarks of our country's democratic system of government. The underlying concern is that if any one branch of our government  executive, legislative, or judicial  encroaches on the powers of another branch, the system of checks and balances built into our government may suffer.
Id. at 1387.
Yet, the cooperation and accommodation between the branches must be a two-way street. And, as Professor Edwin Corwin has pointed out, "not unfrequently ... the action of one [branch] curtails, modifies, or even nullifies that of another." 1 E. Corwin, Corwin on the Constitution 356 (1981). In that regard Charles E. Rice has said that a prerequisite to our form of government as the framers intended it to function is "the jealous assertion by each branch of its own prerogatives." Rice, "Judicial Supremacy and the Balance of Powers," A Blueprint for Judicial Reform 17, 21 (McGuigan & Rader ed. 1981) (hereinafter Rice). L. Brent Bozell expressed the same thought in saying,
The constitutional morality envisioned by The Federalist ... was not a pietistic exhortation to the several departments to behave themselves, but a summons to every department to exercise energetically and resolutely the rights and duties the Constitution had confided to it. The system would break down, the founders of the Republic seem to have been warning us, should ever the components of the system lie down and permit one department to overpower the others by a superior assertion of will.
Bozell, The Warren Revolution (1966), quoted in Rice, supra, at 21.
While as Corwin also said, the legislative branch has a "natural primacy" in that it creates the legislation which the executive branch implements and the judicial branch interprets, Corwin, supra, that primacy, as legislators no doubt agree, does not mean that the entire power of government rests in the legislative branch. As Thomas Jefferson said with reference to an overabundance of legislative power, "the concentrating of [all the powers of government] in the same hands is precisely the definition of despotic government. It will be no alleviation that these powers will be exercised by a plurality of hands ... 173 despots would surely be as oppressive as one... ." The Political Writings of Thomas Jefferson 147 (Dumbauld ed. 1955), quoted in Slotnick, "The Place of Judicial Review in *438 the American Tradition: The Emergence of an Eclectic Power," 71 Judicature 68, 75 (Aug.-Sept. 1987). Jefferson was, of course, very much a proponent of the legislative component of democratic government, and his words simply call attention to a truth with which legislators surely agree and which can sometimes be overlooked.
The statute promulgating $3,500 as the maximum fee for representation in capital cases at the trial level has been in effect since 1981. While even in 1981 that figure surely must have produced results "confiscatory of [an attorney's] time, energy and talents," Makemson, 491 So.2d at 1115, since that time the cost of living has risen 21 percent.[7] Unless the trial courts implement Makemson in the way this dissenting opinion describes, the problem will only become worse as the cost of living continues to rise further above that in 1981.
It may be argued in opposition to this dissenting opinion that it has not been established that attorneys will not make themselves available in cases of this kind for the statutory maximum fee. After all, the argument would be, petitioner in this case made himself available, knowing of the statutory maximum. But that argument would be untenable. It would be like an argument which might be made that there is no need to feed the hungry before they actually starve or that there is no need to close the barn door before the horse gets out. Also, the argument would fly in the face of Makemson. Again, the Florida Supreme Court said in that case that the statutory maximum should not be applied so "as to curtail the court's inherent power to ensure the adequate representation of the criminally accused." 491 So.2d at 1112. That is, in order for the courts to properly exceed the statutory maximum the point need not be reached at which the courts' inherent powers have been destroyed and it is impossible for a trial court to appoint competent counsel. Such impossibility was the rule in Bridges from which Makemson receded. 491 So.2d at 1113.[8]
In this case the trial court said in its findings quoted above that its "task," (i.e., the exercise of its power) "to locate and appoint attorneys to capital cases" is "difficult," which indicates a specific recognition that its power is being curtailed by the statutory maximum. I would assume that the trial court would have said much more in that regard if it had not felt bound to give a narrow interpretation to Makemson.
The hourly equivalent of petitioner's time under the statutory maximum $3,500 fee in this case is $26.12, which is lower than the $27.27 hourly equivalent under the statutory maximum fee which would have been applicable in Gold had the maximum not been exceeded in that case. Gold approved a $4,790 attorney's fee award for the representation of an indigent defendant which was the equivalent of $43.55 per hour. That the equivalent hourly rate which would have resulted if the statutory maximum had been followed in Makemson and Lyons would have been $14.09 and $11.64, respectively, is not a basis for validly distinguishing those cases. Those aspects *439 were not found by the Third District to distinguish Gold. And in all three cases fulfillment of the Sixth Amendment was what was at stake, which is what is at stake here.
See also Board of County Commissioners of Hillsborough County v. Lopez, 518 So.2d 372 (Fla. 2d DCA 1987). In Lopez the county had not questioned that the case was "sufficiently complex to entitle [the attorney] to more than the $3,500 statutory maximum," id. at 373. Therefore what I have referred to above as the trial court's narrow interpretation in this case of Makemson was not in issue in Lopez. But it is of note that in Lopez this court followed Gold which, in the way described above, provides support for this dissent.
As the trial court said, expert testimony supported a fee in this case of $12,135. In light of the normal rate awarded to court-appointed counsel in criminal cases in Pinellas County apparently being $50 per hour (the rate which $6,700 would represent in this case), in recognition that, as Makemson indicates, the nature of the fee to be awarded is a low reasonable fee, not a market value fee, 491 So.2d at 1113, and in light of petitioner's apparent willingness to accept $6,700, an award of $6,700 would not appear to be inappropriate. But I would leave to the trial court the actual amount to be now awarded upon remand.
NOTES
[1] The trial judge who fixed petitioner's fee was not the trial judge who presided at the trial. Petitioner in his appellate brief requests a remand to consider input from the judge who presided at trial. The county argues that petitioner waived that request by not having made it before the fee was fixed and that "the input of the [actual] trial judge [had been] considered through the expert affidavit and through argument at the time of hearing."
[2] The fee petition filed in the trial court states that "Prior to the trial of the instant case, Petitioner was defense counsel in 125 + criminal jury trials, 4 capital case trials, 2 capital appeals before the Florida Supreme Court, and one 2nd degree murder jury trial."
[3] See also Lyons v. Metropolitan Dade County, 507 So.2d 588 (Fla. 1987); Dennis v. Okeechobee County, 491 So.2d 1115 (Fla. 1986).
[4] The trial court made no finding as to the complexity of the case involved here, although the fee petition states. "The complexity of this case as evidenced by the testimony, evidence, and issues adduced at the trial of this cause justifies and mandates payment of an attorney's fee in accordance with the Affidavit in Support of Attorney's Fees attached hereto."
[5] See Lehan, "Is Ours A Noble Profession? Yes, But Let's Prove It!," 59 Fla.B.J. 26, 27, 29, 31-33 (Mar. 1985).
[6] This paragraph was drafted simply from what appears to be common sense and before reading the transcript of the fee hearing in which the following statements of the petitioner to the trial court were made:

I lost business as a result of being involved in this case because I was away from the office. I gave this man absolutely everything that I had during the course of the trial... .
... And this was just a devastating economic situation for me. And I think that even on a compromise level I should be paid $50 an hour.
... .
But if I have to reduce my fee below $50 an hour to handle capital cases, I honestly believe in my own heart that that is confiscatory of my time and of my talents and of my energies.
... .
... And I'll never ever sign up for another one if that's the outcome of this case. And I think a lot of lawyers are going to drop out of the picture; a lot of old timers like myself... .
... .
It can't be done, Judge. I have not charged for my travel time which is a half hour coming and a half hour going every day of this trial. I have not charged for the literally scores of hours I've sat and contemplated this particular case, that I've dreamed about it, that I've studied it, that I thought about it. I never charged for any of that stuff.
We are all trying to give back to this system that which we take from it. And we are grateful for it, but I can't survive and handle these kind of cases and lose all of the people that wanted to come in and hire me at $37 an hour. [Thirty-seven dollars an hour was the rate at which petitioner said he had thought would be his compensation based upon the $5000 fee the trial court had earlier indicated. Petitioner obviously meant that he could not survive if he worked regularly at that rate.] It doesn't compute.
It's a  it makes me embarrassed as a businessman. It hurts my family. It hurts my business.
... [T]hat's the real world.
And all I'm asking for is don't cut my fee down because this is a cap case. Pay me the $50 an hour that you would have paid me on a simple burglary case. And that's all I'm asking. I think that's what the Supreme Court is saying when you have got to pay a man at such a level that it is not confiscatory of his time, energy and talent. And I don't even want to be here. I don't want to challenge anyone on this thing, but I've got to pay my bills if I'm to be available again in the future for these kind of cases.
And I think that I have something to offer to indigents. I've been doing it for thirteen years. I think this is my fifth or sixth capital case. I've argued in front of the Supreme Court on capital cases two times.
I've something to offer these people and I gave this guy a hell of a trial and it didn't work out. But he had some wonderful representation; and that's not my opinion, that's the opinion of the trial judge, the only person who has filed anything in this case who saw it all was the trial judge. And he wrote that I exhibited a high degree of expertise throughout the trial.
And that's all I'm asking.
[7] Monthly statistics released by U.S. Department of labor, Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers, as compiled at Tampa Public Library.
[8] The argument which this paragraph addresses was made by the county to the trial court in this case at the fee hearing. Petitioner's response was:

MR. WHITE: One final footnote simply to rebut the arguments of the representative of the County Attorney's office and that is, if I understood him right, he was basically saying that when I volunteered to take this case that I was aware of the $3,500 cap, which is true as far as it goes.
I was also aware of the Macobson (Phonetic) [sic Makemson] decision which stated that if I got stuck in this case and was unable, you know, to work it out and it went to trial, that if I got in there for two weeks and even though this was a three day trial and we hung in there for two weeks on this thing, that consideration would be given to compensating me over and above the statutory limits. So, there are two sides to that particular statement by the County attorney.
In further response to that argument of the county attorney's office, it may be added that petitioner did not assume the risk of being paid only $3,500. Under his and my interpretation of Makemson he was entitled to assume that the trial court would exceed the statutory maximum if necessary in order to avoid the fee being confiscatory of petitioner's time, energy, and skills.